**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| HENRIETTA MOORE, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-06-4081 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the court are Plaintiff Henrietta Moore ("Moore") and Defendant Michael J.

Astrue's, Commissioner of the Social Security Administration ("Commissioner"), cross-motions for

summary judgment. Moore appeals the determination of an Administrative Law Judge ("ALJ") that

she is not entitled to receive Title II disability insurance benefits or Title XVI supplemental security

income benefits. *See* 42 U.S.C. § 416(i), 423, 1382c(a)(3)(A). Having reviewed the pending

motions, the submissions of the parties, the pleadings, the administrative record, and the applicable

law, it is ordered that Moore's Motion for Summary Judgment (Docket Entry No. 14) is granted, the

Commissioner's Motion for Summary Judgment (Docket Entry No. 15) is denied, and the

Commissioner's decision denying benefits is reversed, and the case is remanded, pursuant to

sentence four, to the Social Security Administration ("SSA") for further proceedings.

**I.**    ***Background***

Moore filed an application for disability insurance benefits and supplemental security income

with the SSA on December 12, 2003, claiming that she had been disabled and unable to work since

June 30, 2003.  (R. 14, 50-58).  Moore alleges that she suffers from degenerative disc disease,[1] namely, lower back and leg pain.  (R. 16, 59-68, 88).  After being denied benefits initially and on reconsideration (R. 24-37), Moore requested an administrative hearing before an ALJ.  (R.38).

A hearing was held on June 21, 2006, in Houston, Texas, at which time the ALJ heard testimony from Moore and Wallace Stanfill, a vocational expert ("VE").  (R. 208-225).  In a decision dated July 28, 2006, the ALJ denied Moore's application for benefits.  (R. 14-20).  On September 21, 2006, Moore appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals.  (R.10-11).  After reviewing additional evidence (*i.e.*, a brief by Moore's counsel), on November 6, 2006, the Appeals Council denied Moore's request to review the ALJ's determination.  (R.6-9).  This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Moore filed this case on December 22, 2006, seeking judicial review of the Commissioner's denial of her claim for benefits.  *See* Docket Entry No. 1.

II.     *Analysis*

A.     *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.  *See* 20 C.F.R. § 416.110.  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C.

---

[1] " Degenerative disc disease" refers to a degeneration or deterioration of the disc.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 465 (29th ed. 2000).  " Discus" or " disc" is a general term in anatomical nomenclature to designate the circular flat plates which extend from the axis to the sacrum. *See id.* at 510-511.

§§ 1382(a), 1382c(a)(3)(A)-(C).  A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which she applies for benefits, no matter how long she has actually been disabled.  *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335.  The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application.  If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335.  Thus, the month following an application, here, July 2003, fixes the earliest date from which benefits can be paid.  (R. 579-581).  Eligibility for SSI payments, however, is not dependent on insured status.  *See* 42 U.S.C. § 1382(a).

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes.  *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100.  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F. 2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).  For purposes of Title II disability benefits, Moore was insured through December 31, 2006.  (R. 14, 16, 20).  Consequently, to be eligible for disability benefits, Moore must prove that she was disabled prior to that date.

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability

in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A). Moreover, the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).

B.  ***Standard of Review***

1.  ***Summary Judgment***

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*. *See Merritt-*

4

*Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.   *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).   "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present."  *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for

that of the Commissioner.  *See Masterson*, 309 F.3d at 272.  In short, "[c]onflicts in the evidence are

for the Commissioner and not the courts to resolve."  *Id*.

   C.   ***ALJ's Determination***

   An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is

capable of performing "substantial gainful activity," or is, in fact, disabled:

1.   An individual who is working and engaging in substantial gainful activity
     will not be found disabled regardless of the medical findings.  *See* 20 C.F.R.
     §§ 404.1520(b), 416.920(b).

2.   An individual who does not have a "severe impairment" will not be found to
     be disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3.   An individual who "meets or equals a listed impairment in Appendix 1" of
     the regulations will be considered disabled without consideration of
     vocational factors.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.   If an individual is capable of performing the work she has done in the past,
     a finding of "not disabled" must be made.  *See* 20 C.F.R. §§ 404.1520(e),
     416.920(e).

5.   If an individual's impairment precludes performance of her past work, then
     other factors, including age, education, past work experience, and residual
     functional capacity must be considered to determine if any work can be
     performed.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05.  The claimant

has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If the

claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show

that other substantial gainful employment is available in the national economy, which the claimant

is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.  If the

Commissioner is able to verify that other work exists in significant numbers in the national economy

that the claimant can perform in spite of her existing impairments, the burden shifts back to the

claimant to prove that she cannot, in fact, perform the alternate work suggested.  *See Boyd*, 239 F.3d at 705.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See id*.

The mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act.  *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  "[A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful

7

work which exists in the national economy . . . .'" *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C.

§ 423(d)(2)(A).  This is true regardless of whether such work exists in the immediate area in which

the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired

if she applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C.

§ 423(d)(2)(A).  In the case at bar, when addressing the first four steps, the ALJ determined:

1.  The claimant met the insured status requirements of the Social Security through December 31, 2006.

2.  The claimant has not engaged in substantial gainful activity since June 30, 2003, the alleged onset date (20 C.F.R. §§ 404.1520(b) and 404.1571 *et seq.*).

3.  The claimant has the following severe impairment: degenerative disc disease (20 C.F.R. § 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work.

6.  The claimant is capable of performing past relevant work as a daycare center director.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

7.  The claimant has not been under a "disability" as defined in the Social Security Act, from June 30, 2003 through the date of this decision (20 C.F.R. § 404.1520(f)).

(R. 16-18, 20).  Because the ALJ found that Moore could perform her past relevant work as a

daycare center director as that job is generally performed in the national economy at a sedentary

exertion level, the ALJ did not proceed to step five of the sequential evaluation process.  (R. 20, 116,

223).

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Moore's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

### D.   *Issues Presented*

Moore contends that the decision of the ALJ is not supported by substantial evidence. Specifically, Moore claims that the ALJ erred by: (1) failing to consult a medical expert to assist in interpreting the evidence and formulating Moore's residual functional capacity; (2) failed to develop the record on Moore's alleged mental impairments; and (3) erred in failing to conduct a meaningful evaluation of Moore's credibility. *See* Docket Entry Nos. 14 and 17. The Commissioner disagrees with Moore's contentions, maintaining that the ALJ's decision is supported by substantial evidence. *See* Docket Entry No. 15.

**E.**     *Review of ALJ's Decision*

**1.**     *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry. *See id*. at 532; *see also* 20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393. The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that her impairment or combination of impairments is equivalent to or greater than a listed impairment. *See id.* at 530-31; *Selders*, 914 F.2d

at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id*.  An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. §§ 404.1526(a), 416.926(a).  The applicable regulations further provide:

> (1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
> (A)    You do not exhibit one or more of the medical findings specified in the particular listing, or
>
> (B)    You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;
>
> (ii)   We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a).  Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."  *Zebley*, 493 U.S. at 531.

11

Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. §§ 404.1527(e), 416.927(e).

A review of the medical records submitted in connection with Moore's administrative hearing reveals that she has a history of back pain. In 1986, Moore allegedly fell down some stairs and heard her back pop. (R. 121, 124). In January 1989, Moore visited family practitioner, William Z. Cohen, M.D. ("Dr. Cohen"), complaining of a sore throat and a cough. (R. 135). During the appointment, she also reported that she could not sleep; she had undergone a tuberculosis screen; her mother was sick; and she "upset easily." (R. 135). Dr. Cohen diagnosed her with laryngitis and depression, and prescribed medication to treat her throat and an antidepressant medication to treat her depression (*i.e.*, Doxepin). (R. 135). Dr. Cohen's progress notes of Moore in 1989 through January 1990 are primarily reflecting medication refills. (R. 136).

In August 1990, Moore visited Dr. Cohen, complaining that she could not sleep and was experiencing headaches. (R. 137). She further reported that she had not been taking the Doxepin. (R. 137). Dr. Cohen continued Moore on her medications. (R. 137).

In February 2001, Dr. Cohen refilled Moore's prescription for Doxepin. (R. 137). In March 1991, Moore visited Dr. Cohen, complaining of headaches and "hot flashes." (R. 137). Moore reported that she had "run out" of Doxepin two weeks prior. (R. 137). Dr. Cohen refilled her prescription. (R. 137). In May 1991, Moore visited Dr. Cohen, complaining of back pain and vaginal discharge. (R. 139). Dr. Cohen prescribed Moore Vicodin and Cipro. (R. 139). Lab work revealed that Moore tested positive for chlamydia. (R. 138, 140). Dr. Cohen's progress notes of Moore in 1991 primarily reflect medication refills. (R. 139, 142). On December 27, 1991, Moore

visited Dr. Cohen, complaining of lower back pain.  (R. 142).  Dr. Cohen also took a pap smear and prescribed medication for Moore and her husband.  (R. 142).

In 2002, Dr. Cohen's progress notes of Moore are mainly medication refills.  (R. 142-143, 145).  In September 1992, Moore visited Dr. Cohen complaining of lower back pain.  (R. 143).  She advised Dr. Cohen that she had "injured" her back three weeks prior.  (R. 143).  Moore alleged that the pain "comes and goes," and that standing makes it worse as well as when under pressure/stress.  (R. 143).  Moore told Dr. Cohen that the medication helps her sleep and that she needed a refill of Doxepin.  (R. 143).  Dr. Cohen diagnosed Moore with lumbar fibromyalgia,[2] prescribed Ibuprofen 600 mg. and Doxepin.  (R. 143).  Dr. Cohen advised Moore to take her medication regularly.  (R. 143).

In January 1993, Moore visited Dr. Cohen, complaining of back pain.  (R. 145).  Moore reported that her back pain "flares up" at aerobics.  (R. 145).  Dr. Cohen diagnosed her with lumbar fibromyalgia and prescribed medication.  (R. 145-146).  In April 1993, Moore visited Dr. Cohen, complaining of back pain from lifting a child and hot flashes at night.  (R. 146).  Dr. Cohen changed Moore prescription for sleep medication.  (R. 146).  In October 1993, Moore visited Dr. Cohen, complaining of migraine headaches and being under a lot of stress at work.  (R. 147).  Moore reported that she had "stopped Doxepin" two weeks prior.  (R. 147).  Dr. Cohen continued Moore on her medications.  (R. 147).  The remainder of Dr. Cohen's treatment notes for Moore in 1993 through 1995 reflect medication refills.  (R. 146-148).

---

[2]  "Fibromyalgia" is pain and stiffness in the muscles and joints that is either diffuse or has multiple trigger points.  *See* DORLAND'S, *supra*, at 673.

In June 1995, Moore visited Dr. Cohen, complaining of lower back pain due to pushing a "turn around" at work.  (R. 148).  Dr. Cohen recommended lumbar support and prescribed medication. (R. 148). Dr. Cohen's progress notes for Moore in 1995 through 1997 primarily reflect medication refills.  (R. 148, 150).

In September 1997, Moore complained of chronic back pain to Dr. Cohen.  (R. 151).  In December 1997, Moore visited Dr. Cohen, complaining of lower back pain after she "slipped and fell at home."  (R. 151).  Dr. Cohen's treatment notes for 1998 reflect only medication refills. (R. 152).

After being denied a medication refill because a follow-up appointment was needed, on March 19, 1999, Moore visited Dr. Cohen complaining of lower back pain. (R. 152). Moore alleged that she had aggravated her back recently during aerobics. (R. 152).  Moore also complained of sleep difficulty and mood swings, and requested Doxepin. (R. 152).  Dr. Cohen noted increased weight gain and hypertension.  (R. 152).  Dr. Cohen reported no tenderness and full flexion of Moore's spine.  (R. 153).  Dr. Cohen prescribed Moore medication.  (R. 153).  In December 1999, Moore visited Dr. Cohen, complaining of lower back pain that goes down to her legs.  (R. 153).  Dr. Cohen noted tenderness across her lumbar spine, but full flexion. (R. 153).  The remainder of Dr. Cohen's treatment notes for Moore from 1999 through 2001 primarily reflect medication refills. (R. 152-153, 155-156).

On May 22, 2001, Moore visited Christopher Sim, M.D. ("Dr. Sim"), complaining of lower back pain.  (R. 176).  Moore reported that she injured it while exercising on machines and lifting weights.  (R. 176).  Dr. Sim's assessment was lumbar fibromyalgia and weight gain.  (R. 176).  Dr.

14

Sim recommended epidural steroid injections ("ESI"), but Moore refused. (R. 176). At that time, Dr. Sim noted "no lifting." (R. 176).

After being denied a medication refill because an office visit was needed, in July 2001, Moore visited Dr. Cohen, complaining of chronic back pain and depression. (R. 156). No symptoms are noted, but Dr. Cohen refilled Moore's medication. (R. 156).

In February 2002, Moore visited Dr. Cohen, complaining of back pain. (R. 157). Moore alleged that she took Ibuprofen, but it did not provide relief. (R. 157). Dr. Cohen modified Moore's medication. (R. 157). Dr. Cohen's progress notes from March and April 2002 reflect only medication refills. (R. 157).

In April 2002, an MRI of Moore's lumbar spine revealed multi-level lumbar spondylosis.[3] (R. 117). The most prominent level of degenerative change was noted at L3-L4. (R. 117). It also showed a high signal intensity annular fissure partly within the left neural foramen exit zone, which the neuroradiologist opined could be a source of discogenic pain. (R. 117). Although difficult to read, treatment notes from May 2002 through March 2004, reflect numerous prescription refills for Motrin/Ibuprofen 800 mg., Vicodin, Doxepin, and Soma. (R. 118-120). With the exception of one reference to back pain (R. 120), the notes only reflect prescription refills. (R118-120).

In April 2004, Moore had an independent medical consultative examination with Donald Gibson II, M.D. ("Dr. Gibson"). (R. 121-123). Dr. Gibson reported that Moore had pain in her lower back and had difficulty, but was able to stand and walk. (R. 121). Dr. Gibson further reported that Moore did not require pain medication, physical therapy, back brace, or other assistive devices

---

[3] "Lumbar spondylosis," degenerative joint disease affecting the lumbar vertebrae and intervertebral disks, causing pain and stiffness, sometimes with sciatic radiation due to nerve root pressure by associated protruding disks or osteophytes. *See* DORLAND'S, *supra*, at 1684.

for ambulation; however, he noted that Moore took muscle relaxants.  (R. 121).  Moore's medications were noted at Motrin and Soma.  (R. 121).  At that time, Moore's pain was 5 out of 10.  (R. 121).

Upon examination, Dr. Gibson noted that Moore had no tenderness or loss of motion of the lumbar spine.  (R. 122).  Additionally, there was no evidence of any motor or sensory loss; her gait and coordination were assessed as being "normal."  (R. 123).  Moore's gross mental status was reported as "clear."  (R. 122).  Dr. Gibson's reported that an x-ray of Moore's lumbar spine revealed no fractures or dislocations.  (R. 123).  There was mild facet degeneration.  (R. 123).  The curvature of her lumbar spine was observed to be normal.  (R. 123).  Dr. Gibson noted that Moore's forward flexion was 90 degrees and there was no limitation in her range of motion.  (R. 123).  Dr. Gibson opined that her residual functional capacity was at the light level.  (R. 123).

Relying on Dr. Gibson's assessment, on April 29, 2004, the State Agency medical consultants opined that, in spite of her impairment, Moore was able to lift and/or carry 25 pounds frequently and 50 pounds occasionally, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour work day, and sit (with normal breaks) for a total of about 6 hours in an 8-hour work day.  (R. 125-132).

After being denied a medication refill because an office visit was needed, on May 18, 2004, Moore visited Dr. Cohen, complaining of "severe back pain" that "precludes work."  (R. 160).  Dr. Cohen noted "no consistent specialist evaluation" and referred Moore to John DeBender, M.D. ("Dr. DeBender").  (R. 159-160).  Dr. Cohen noted that Moore may be a candidate for ESI.  (R. 159).  The remainder of Dr. Cohen's treatment notes for 2004 are for medication refills.  (R. 160-161).

In June 2004, Moore visited Dr. DeBender, complaining of lower back pain.  (R. 124).

Moore noted that she was taking Motrin for pain and Soma, as needed, at night; however, she alleged

that the Motrin was no longer helping.  (R. 124).  Moore advised Dr. DeBender that Dr. Cohen had

recommended ESI and physical therapy, but she alleged that she could not afford the treatment.

(R. 124).  Dr. DeBender reported that Moore had limited range of motion of the lumbar spine with

spasms.  (R. 124).  Moore also had negative straight leg raise tests, and symmetrical reflexes.

(R. 124).  Dr. DeBender's impression was that Moore had a disc bulge at L3-L4, nerve root irritation,

and spondylosis.  (R. 124).  Dr. DeBender modified Moore's medication and noted that if there was

no improvement in one week for Moore to call and set up ESI injections.  (R. 124).

In October 2004, Moore visited Dr. DeBender for a follow-up appointment.  (R. 175).  Dr.

DeBender recommended ESI, but Moore reportedly was "scared to do ESI."  (R. 175).  Also, Moore

reported that she could not afford physical therapy.  (R. 175).  Dr. DeBender continued her

medications and advised Moore to call when ready to proceed with ESI.  (R. 175).

On December 14, 2004, Moore visited Dr. Sim, complaining of pain from the back of her

neck to the shoulder, chest pain, as well as back pain.  (R. 179-180).  At that time, Moore rated her

pain an 8 or 9 out of 10.  (R. 179).  Moore advised Dr. Sim that her current medications were

Darvocet and Celebrex for back pain.  (R. 179).  When reviewing Moore's body systems, no

psychological issues were noted by Dr. Sim.  (R. 179).  Dr. Sim noted that Moore was in "no acute

distress."  Upon examination, Dr. Sims noted Moore as having paraspinal tenderness and spasm at

C6-7 and L5/S1.  (R. 180).  Dr. Sims did not report any loss of motion of Moore's lumbar spine or

extremities.  (R. 180).  Also, Dr. Sim indicated that there was no evidence of any motor or sensory

loss.  (R. 179-180).  Dr. Sim's assessment was lumbar radiculopathy.[4]  (R. 180).  Dr. Sim recommended proper posture and no lifting.  (R. 180).  Dr. Sim continued Moore's pain medication.  (R. 180).  Dr. Sim ordered an x-ray of Moore's cervical and lumbar spine, which revealed severe degenerative change throughout the cervical spine.  (R. 178).  Marked interspace narrowing with associated sclerosis and spurring was seen at multiple levels, including C3-4, C4-5, C5-6, and C6-7.  (R. 178).  Also noted was hypertrophic spur formation with encroachment on the neural foramina at C5-6 and C5-7 bilaterally.  (R. 178).  The radiologist recommended and MRI or CT Scan if Moore had radicular symptoms.  (R. 178).

On February 22, 2005, Moore had MRIs taken of her cervical and lumbar spine.  (R. 162-163).  The MRI of her cervical spine revealed abnormal reversal of the curvature of the upper cervical spine, suggesting muscular spasm.  (R. 162).  Also, noted was acquired spinal stenosis at C4-5 and C5-6.  (R. 162).  The MRI of Moore's lumbar spine indicated that the vertebral bodies showed normal signal marrow and were intact.  (R. 163).  The only marrow signal abnormality was to the endplates on either side of L3-4 where there was reactive tight endplate change due to marked thinning of the disc at that level.  (R. 163).  Posteriorly, there was seen to be a focal disc herniation possibly an extrusion on the left side and it appeared to touch the thecal sac.  (R. 163).  Axial images confirmed the left-sided L3-4 disc herniation or extrusion.  (R. 163).  It reportedly was impacting on the left side of the thecal sac without causing excessive spinal stenosis.  (R. 163).  No other abnormalities were noted.  (R. 163).

---

[4]  "Radiculopathy" is a disease of the nerve roots.  *See* DORLAND'S, *supra*, at 1511.  Therefore, "lumbar radiculopathy" is a disease of the nerve roots near the sides of the back between the thorax and the pelvis.

After being denied a medication refill because a follow-up appointment was required, on February 28, 2005, Moore visited Dr. Cohen to obtain prescription refills. (R. 161, 164). Dr. Cohen noted that Moore was "seeing" Dr. DeBender for lower back pain and that she had "seen" a gynecologist. (R. 164). Dr. Cohen refilled Moore's prescriptions for Doxepin and Soma. (R. 164).

In March 2005, Dr. Cohen refilled pain medication for Moore. (R. 164). In June 2005, Moore visited Dr. Cohen, complaining of "unbearable" back pain and requesting medication. (R. 164). Dr. Cohen discussed ESI with Moore and prescribed Tylenol No. 4. (R. 164).

In May 2005, Moore visited Dr. DeBender for a follow-up appointment. (R. 165). Moore complained of neck and lower back pain. (R. 165). Dr. DeBender reviewed the MRIs and recommended that consult with a neurosurgeon for spinal surgery. (R. 165).

On June 16, 2005, Dr. Cohen refilled Moore's back medication. (R. 164). On that same day, Dr. Cohen referred Moore to physical therapy to manage her pain symptoms. (R. 166). On June 22, 2005, Moore went to Action Plus Rehab for an initial evaluation. (R. 167-168). Moore reported that two doctors had recommended, but she had declined. (R. 167). At that time, Moore claimed that her pain level was a 9 out of 10. (R. 167). Moore had limited range of motion with flexion performed to 19 degrees and tenderness to palpation of her lumbar spine. (R. 168). Moore had 10 degrees of extension, with lateral flexion of 15 degrees and 16 degrees, respectively on the right and left. Also, it was noted that Moore was intact in regard to sensation and had 4+/5 strength in her lower extremities. (R. 168). Moore's straight leg test were negative. (R. 168). Moore's treatment plan was for physical therapy three times a week for four weeks. (R. 168).

Moore's physical therapy notes dated June 22, 23, 28, 29, 2005, reflect continued lower back pain and soreness. (R. 186-192). On July 5, 2005, the physical therapy notes reflect Moore

19

complained of lower back pain, but was "feeling better."  (R. 192).  The next day, July 6, 2005, Moore reported stiffness and low back pain due to walking on the treadmill at the gym and re-aggravating her back.  (R. 193).  Moore was advised to follow the rehabilitation program.  (R. 193). On July 7, 2005, Moore reported that "she felt better."  (R. 193).  On July 12, 2005, Moore advised that she was "stiff, but OK."  (R. 193).  Moore's lumbar pain was noted as still present, but diminished.  (R. 193).  On July 19, 2005, Moore reported that she was feeling better.  (R. 194).  On July 21, 2005, it was reported that Moore had "no more complaints" and "minimal pain noted." (R. 194).  On July 22, 2005, after completing 11 treatments, Moore stated that she would not be coming back for her remaining visit because her husband was having health problems and she wanted to give him a break from bringing her to therapy.  (R. 170, 183).

On August 1, 2005, Moore's physical therapy discharge report indicated that she had made good progress, had decreased symptoms, and an improved functional status.  (R. 170).  Moore reportedly had an overall decrease in pain symptoms, but pain was still noted with repetitive bending and stooping.  (R. 170).  Also, it was noted that Moore had declined surgery and understood she would have back pain for a long time.  (R. 170).  A home exercise program was provided to Moore. (R. 170).

On August 29, 2005, Moore visited Dr. Cohen, requesting prescription refills.  (R. 169).  Dr. Cohen discussed exercise with Moore and continued her medications.  (R. 169).  The remainder of Dr. Cohen's progress notes for 2005 merely reflect medication refills.  (R. 169).

On May 15, 2006, Moore visited Dr. Cohen, complaining that her back pain had moved closer to her tail bone and she had developed pain in her hip area.  (R. 171).  Dr. Cohen noted that Moore had "fair" range of motion of her back with "discomfort" when bending or twisting.  (R. 171).

20

Dr. Cohen continued Moore's medications.  Dr. Cohen requested a bone density test and an x-ray of Moore's right hip.  (R. 172-173).  The remainder of Dr. Cohen's progress notes for 2006 are for medication refills.  (R. 171).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings.  *See Scott*, 770 F.2d at 485.  Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown.  *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211.  It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

a.    *__Depression__*

In the present case, Moore testified during the hearing as to having on-going symptoms of depression, including crying spells, social isolation, decreased energy, irritability, and diminished interest in activities. (R. 214-215, 222). The ALJ found at step two of the sequential evaluation that Moore did not have a "severe" mental impairment. In reaching this conclusion, the ALJ noted that Moore did not indicate that she had limitations associated with a mental impairment on her application for benefits. (R. 60, 71, 73, 86, 87). The Social Security regulations provide that the SSA will only consider impairments that a claimant alleges or "about which we receive evidence." *See* 20 C.F.R. § 404.1512(a). The ALJ, however, failed to note that some parts of the application that questioned whether Moore had been treated for emotional or mental problems that limited her ability work were either incomplete or positively marked. (R. 62, 88, 102).

The ALJ correctly noted that the record contained no evidence of any psychiatric or psychological treatment and that Moore's primary care physician, Dr. Cohen, scarcely documents any on-going symptoms. Notwithstanding, there are several notations in Dr. Cohen's progress notes indicating that he would not refill Moore's antidepressant medication until she came in for an office visit. (R. 152, 156, 160, 161, 164). Dr. Cohen's notes do not reflect what discussion(s) were had about Moore's depression, but, in each instance antidepressant medication was continued. The record is chalked full of references to the fact that Moore was on antidepressant medication.

The record in this case is very limited as to Moore' alleged depression. Aside from Moore's testimony that her depression resulted in functional limitations (R. 222), there are no references to Moore having difficulties in maintaining social functioning, concentration, persistence, or pace, or repeated episodes of decompensation. *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a); *see also Salles*

22

*v. Commissioner of Soc. Sec.*, 229 Fed. Appx. 140, 145 (3d Cir. 2007) (diagnoses alone are insufficient to establish their severity at Step Two; claimant must present evidence that these limitations significantly limited her ability to do basic work activities or impaired her capacity to cope with the mental demands of working); *Cf. Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1986) (isolated comments by claimant insufficient to raise suspicion of mental impairment necessary to require ALJ to order consultative examination).

Here, however, there were ample references to Moore's alleged mental limitations in parts of her application for benefits as well as in her testimony.  Moreover, to the extent Dr. Cohen's progress notes are silent as to any on-going symptoms of Moore's depression that warranted his continuing antidepressant medication for over 17 years, this standing alone was sufficient to raise suspicion regarding Moore's mental capacity and triggered an analysis of the same.  As such, the ALJ erred in failing to develop the record further in this regard.  *See Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994).  It is the duty of the ALJ to "fully and fairly develop the facts relative to a claim for benefits." *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989).  Here, ALJ acknowledged at the administrative hearing that "we don't have much evidence at the present time here about the depression.  Just the back."  (R. 222).

Consequently, the case must be remanded for proper consideration of Moore's alleged depression, including, if necessary, ordering a consultative examination.  *See Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984).  It may be of benefit to the ALJ to have a medical expert present at any new administrative hearing to properly review and evaluate the medical evidence.

23

b.     *Degenerative Disc Disease*

With respect to Moore's degenerative disc disease, the ALJ found that Moore did not have

an impairment or combination of impairments that medically equals a Listing.  (R. 17).  Although

the ALJ acknowledges that diagnostic studies performed in 2005 showed focal herniation and

marked thinning of the disc at L3/4, which impacted the thecal sac as well herniations and spinal

stenosis at C4/5 and C5/6 (R. 162-163), the ALJ, inexplicably refers back to examinations in 2004

in an attempt to undermine the severity of Moore's alleged impairment.  (R. 17).  Indeed, the ALJ

noted that in Dr. Gibson's consultative examination in April 2004, Moore had no tenderness or loss

of motion.  (R. 17, 121-123).  Similarly, the ALJ noted an examination in October 2004 by Dr.

DeBender as "being within normal limits" and failed to note any on-going motor, sensory, or reflex

loss.  (R. 17).  The ALJ failed to note, however, that during these visits Dr. DeBender recommended

ESI and/or spinal surgery, which contradicts the ALJ's interpretation of the severity of Moore's back

pain.  (R. 165, 175).  This type of selective review of the record has been expressly renounced by the

Fifth Circuit.  "[T]he ALJ must consider all the record evidence and cannot 'pick and choose' only

the evidence that support his position."  *Loza*, 219 F.3d at 393.

Moreover, the medical records that were obtained *after* the State Agency physician review

in 2004, but *before* the hearing in 2006, indicated a worsening of Moore's degenerative disc disease.

(R. 117, 162, 163, 178).  Under these circumstances, it was inappropriate for the ALJ to rely on the

State Agency or Dr. Gibson's 2004 assessments.  No medical doctor testified at the hearing and the

ALJ failed to provide sufficient reasoning as to why he rejected subsequent objective medical

records.  The ALJ is not qualified to make medical assessments regarding the severity of Moore's

condition; the ALJ appears to have "played doctor."  *See Frank v. Barnhart*, 326 F.3d 618, 622 (5th

24

Cir. 2003).  In sum, this case must be remanded for the ALJ to properly consider, if necessary by a medical doctor, the severity of Moore's degenerative disc disease

### 2.    *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints.  *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a plaintiff alleges disability resulting from pain, she must establish a medically determinable impairment that is capable of producing disabling pain.  *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.  *See id.*  It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128.  The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 n.18.  Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability.  *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267,

25

1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281. It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference. *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706. However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Moore testified regarding her complaints of pain. (R. 212-214, 216-219, 221-222). The ALJ's decision indicates that the ALJ did consider objective and subjective indicators related to the severity of Moore's pain:

> The undersigned finds the claimant's testimony regarding her symptoms and the intensity, duration and limiting effects of these symptoms to be unsupported by the medical record.

> \* \* \*

> The record contains no evidence to support the claimant's allegations of pain and weakness in her hands. Specifically, the record contains no evidence that the claimant has ever voiced these particular complaints to any of her treating sources. Moreover, as noted above, none of the claimant's treating sources have indicated that she had any motor deficits or loss of motion of her upper extremities. Likewise, the record contains no evidence that the claimant have ever voiced any complaints regarding side effects of her medications.

* * *

> The claimant has also testified to limited activities of daily living and a need to lie down throughout the day.  The record, however, contains no objective evidence to support the claimant's statements.  Nevertheless, the undersigned is cognizant that an individual's daily activities are only one factor taken into consideration for a finding on credibility.  Other factors include the objective evidence and opinions, clinical and laboratory findings, the extent of medical treatment and relief from medication and therapy, the claimant's work history, attempts to seek relief from symptoms, and the extent, frequency, and duration of symptoms.  Taking all these factors into consideration, the undersigned concludes that the claimant has been less than forthcoming regarding her symptoms and limitations.

(R. 18, 19).

While the ALJ properly found that there was no evidence in the medical records to corroborate Moore's allegations of pain in her hands and/or side effects of her medications, the ALJ's assessment is flawed as it relates to Moore's symptoms and limitations regarding her back. As noted above, the medical record is replete with references over the past 20 years to Moore's back pain.  The medical records document that is has become increasingly worse.  Over the years, the severity of degenerative changes in Moore's cervical and lumbar spine are documented in diagnostic studies.  (R. 117, 162, 163, 178).  These objective records lend support to Moore's subjective testimony regarding her pain and limitations.  As such, the ALJ's determination regarding Moore's credibility and pain level is not supported by substantial evidence.  Hence, this case must be remanded for a proper evaluation of both the objective and subjective indications of Moore's back pain.

**3.**     ***Residual Functional Capacity***

Under the Act, a person is considered disabled:

. . . only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er]

27

> age, education, and work experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of whether such work exists
> in the immediate area in which [s]he lives, or whether a specific job vacancy exists
> for h[er], or whether [s]he would be hired if [s]he applied for work. . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow her to perform work in the national economy.  *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested.  *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed.  *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.  This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment.  *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.  Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work.  *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *see also* 20 C.F.R. § 404.1545.  When a claimant's residual functional capacity is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work.  *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520.  The testimony of a vocational expert is valuable in this

regard, as "she is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR").  *See Myers*, 238 F.3d at 620.  The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id*.  In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity.  *See id*.  In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule.  The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . .  RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands:  sitting, standing, walking, lifting, carrying, pushing, and pulling.  Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . .  The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996).  The court further commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . .  The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50.  Since age, education, and work experience are not usually

significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.* To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis. *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

In the case at bar, the ALJ failed to formulate hypothetical questions for the VE that encompassed all of Moore's recognized limitations. The ALJ posed the following questions to the VE regarding the exertion level of Moore's former positions as day care director and day care worker:

> Q:    So, the daycare center, assistant director is considered sedentary and I suppose that that's the type of job where you change positions, right?
>
> A:    Yes, Your Honor.
>
> Q:    That way when she want to be sitting down she can be sitting down, when she wants to be walking or standing she can change position. But why do, she [INAUDIBLE] described as two ways to identify the claimant, one is light and the other one is medium, right?
>
> A:    Yes. In the two different exhibits that you quoted earlier.
>
> Q:    And the DOT says sedentary?
>
> A:    That's correct, sir.
>
> Q:    Which mean that in the most area of the United States done at the sedentary level?

30

A:     Yes, sir.  The director would primarily be doing supervisory and office work, yes, sir.

Q:     And the other one, the child day care worker center is a light, type of work, right?

A:     In the DOT, yes, sir.

Q:     Does the person change position there too?

A:     To a certain extent, yes, sir.

(R. 223).  Moore's counsel presented the VE with several modified hypotheticals:  (1) a claimant who can lift no more than five pounds; (2) a claimant who is required to spend three to four hours a day reclining or resting; or (3) a claimant who is incapable of attending to the work or concentrating sufficiently for two hours of an eight-hour work day because of pain and/or medication side effects.  (R. 224).  In response to each modified hypothetical, the VE testified that the claimant would be incapable of doing any past relevant work or any other competitive employment.  (R. 224).

Only where the testimony by the VE is based on a correct account of a claimant's qualifications and restrictions, may an ALJ properly rely on the VE's testimony and conclusion.  *See Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995).  Unless there is evidence in the record to adequately support the assumptions made by the VE, the opinion expressed by the VE is meaningless.  *See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  Here, the ALJ failed to formulate a hypothetical question to the VE that incorporated Moore's alleged physical and/or mental limitations.  As set forth above, the improperly assessed the severity of Moore's degenerative disc disease.  Likewise, the ALJ's determination regarding Moore's credibility and pain level is not supported by substantial evidence.  Because the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden to show that despite Moore's impairments,

Moore can perform her past relevant work.  *See Boyd*, 239 F.3d at 708.  As such, the case must be remanded.

**III.**     *Conclusion*

Accordingly, it is, therefore

**ORDERED** that Moore's Motion for Summary Judgment (Docket Entry No. 14) is **GRANTED**.  It is further

**ORDERED** that Commissioner's Motion for Summary Judgment (Docket Entry No. 15) is **DENIED**.  It is finally

**ORDERED** that the Commissioner's decision is **REVERSED** and **REMANDED** to the Commissioner, pursuant to "sentence four" of the Social Security Act, 42 U.S.C. § 405(g), for a new hearing to properly consider, if necessary by a medical doctor, the severity of Moore's degenerative disc disease, to evaluate Moore's alleged mental limitations, properly review both objective and subjective factors related to Moore's symptoms of pain, develop clear testimony from a VE regarding jobs, if any, Moore is capable of performing considering all of her limitations.

**SIGNED** at Houston, Texas on this <u>31st</u> day of March, 2008.

Calvin Botley
United States Magistrate Judge